2015 IL App (1st) 132631

FIRST DIVISION
APRIL 27, 2015

No. 1-13-2631

| | | |
|---|---|---|
| MARILYN KAYMAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 L 14429 |
| | ) | |
| JANICE MATTHEWS RASHEED, | ) | Honorable |
| | ) | Lynn M. Egan, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Connors concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury verdict in the circuit court of Cook County awarding her zero damages for future pain or medical treatment, plaintiff-appellant Marilyn Kayman appeals from various evidentiary rulings and contends that the jury's verdict was against the manifest weight of the evidence.

¶ 2                    BACKGROUND

¶ 3    This case arises from a motor vehicle collision on January 30, 2009, in which Kayman's vehicle was was struck from behind by a vehicle driven by defendant-appellee Janice Matthews Rasheed.  Kayman went to an emergency room at Hinsdale Hospital shortly after the accident but was discharged on the same day.  Due to persistent neck pain and other symptoms, Kayman visited her family physician, Dr. John Conroy, on February 4, 2009.  She was subsequently referred by Dr. Conroy to Hinsdale Orthopedics, where she was treated between 2009 and 2012. At the recommendation of Hinsdale Orthopedics, Kayman underwent physical therapy and was also prescribed medical devices to use at home to help alleviate her pain.

¶ 4 Kayman sued Rasheed, claiming that the accident had caused her neck and back pain, headaches, and other symptoms. Rasheed admitted negligence in striking Kayman's vehicle, but disputed the extent to which the 2009 collision caused Kayman's alleged injuries. In Kayman's pretrial deposition, she denied any problem with neck or back pain prior to the January 2009 collision.[1] However, medical records revealed that Kayman had complained of neck and back pain in January 2005 and May 2006 and underwent an MRI in 2006 as a result of these complaints. In March 2012, Rasheed's counsel deposed Dr. Conroy. Although he had not been Kayman's physician at the time of these prior complaints, Dr. Conroy was shown medical records corresponding to Kayman's 2005-06 neck and back pain complaints and testified regarding these records.

¶ 5 On October 16, 2012, the trial court agreed to continue the previously scheduled trial date in order to allow Kayman more time to complete her discovery obligations, including her disclosure of trial witnesses pursuant to Illinois Supreme Court Rule 213(f). Ill. S. Ct. R. 213(f) (eff. July 1, 2002). The court subsequently explained that it granted the continuance out of a "desire to proceed to a trial on the merits rather than precluding plaintiff from presenting certain claims because of discovery violations."

¶ 6 Trial was continued to February 11, 2013. On that date, the court heard argument on various motions *in limine*. Among these motions, Rasheed moved to bar Kayman from presenting a "day-in-the-life" video which purported to show Kayman demonstrating her prescribed daily exercise routine and equipment she used to treat her injuries. Rasheed

---

[1]The actual deposition was not made part of the appellate record, but Kayman does not dispute that her deposition testimony denied prior neck or back pain.

complained that the video was untimely and cumulative. Kayman acknowledged the video had not been disclosed until about two weeks earlier, but argued it was created recently so as to accurately reflect Kayman's exercise routine as of the time of trial.

¶ 7    The trial court barred the video as untimely, noting the trial had been continued in October 2012 "solely because of plaintiff's failure to comply with discovery requests." The trial court remarked that "day-in-the life films need to be disclosed like any other piece of evidence and the issue comes down to whether the disclosure is timely." Although the court acknowledged the desire to demonstrate Kayman's current routine, it nonetheless found disclosure was untimely, especially as the trial date had been continued due to Kayman's lack of compliance with discovery. Thus the court granted Rasheed's motion to bar the video.

¶ 8    In another motion, Rasheed argued that Kayman should be barred from seeking damages for lost wages related to time spent attending physical therapy sessions. Rasheed argued that Kayman had admitted she was a salaried employee, that her employer did not penalize her for going to physical therapy sessions, and thus she "didn't suffer any kind of wage loss." Kayman's counsel acknowledged "she was on a salary, she didn't lose her money" but that "she took off time from work during the workday to go get physical therapy." In response to the trial court's questions, Kayman's counsel confirmed that she did not have to use vacation time or sick time but argued she suffered "not a loss of income" but a "loss of time." The court granted the motion to preclude the claim, finding there was no compensable loss in income or benefits.

¶ 9    During the same argument, Kayman raised the issue of whether, with respect to Kayman's emergency room records, "the Court will allow [counsel] in closing argument to read from those records if a witness has not specifically been testifying about those records." The

court responded that if Rasheed stipulated that these were business records, "they would be admitted and you can comment in closing argument on all admitted evidence and the reasonable inferences therefrom." However, the court further stated that "[m]erely because something is admitted as an exhibit doesn't mean it goes back to the jury room." Rasheed's counsel stipulated on the record that the emergency room records were business records, but stated "we're obviously objecting as to those records being read into evidence."

¶ 10    In another motion *in limine,* Rasheed sought to preclude admission of a photograph showing significant damage to the front of Rasheed's car from the impact with Kayman's vehicle. Kayman argued the photo should be admitted to show that "it was a very serious accident" and to demonstrate the severity of Kayman's injuries. Further, as Rasheed had testified in her deposition that her vehicle was only traveling at a speed of five miles per hour at the time of impact, Kayman argued the photograph was also admissible as impeachment evidence.

¶ 11    The court held that the photograph of the vehicle damage would not be admissible for the purpose of demonstrating the severity of Kayman's injuries, as it was "beyond the kin [*sic*] of the average juror to correlate it to a particular type of physical injury." However, the court held the photograph would be admissible "to impeach defendant's testimony that the accident occurred when the vehicles were traveling 5 miles per hour," finding that the average juror would understand that the damage shown was "far in excess of what one typically sees with a vehicle traveling 5 miles per hour." The court emphasized the photograph was for impeachment purposes only on the issue of speed but not to be argued as evidence of the nature of Kayman's injuries.

¶ 12    The trial court also heard argument regarding the admissibility of the portions of Dr. Conroy's deposition referencing Kayman's 2005-06 pre-accident complaints of back and neck pain. Kayman argued that since Rasheed failed to offer any expert witness testimony suggesting any relationship between the prior complaints and Kayman's current symptoms, the evidence of prior injury was inadmissible. Rasheed countered that, in light of Kayman's deposition testimony denying prior neck or back problems, the excerpts from Dr. Conroy's deposition were admissible for impeachment purposes.

¶ 13    The court recognized that Rasheed had not laid a foundation for the 2005-06 complaints to be admitted as substantive evidence, but agreed that "because [Kayman] denied under oath ever having those complaints, it is proper for impeachment purposes." The court specified that Dr. Conroy's deposition could be admissible "for impeachment use only, and it's impeachment on [Kayman's] credibility." The court explained that Kayman had to "pick her poison" in deciding whether she would acknowledge the prior complaints in her trial testimony: Kayman could avoid introduction of Dr. Conroy's deposition if she acknowledged the 2005-06 complaints on direct examination, but the court cautioned that her acknowledgement of prior complaints would also "open herself up to be asked about it" on cross-examination.

¶ 14    The case proceeded to trial on February 14, 2013. Kayman first called Rasheed to testify as an adverse witness. Rasheed acknowledged that her vehicle rear-ended Kayman's but testified that she did not recall the speed of her vehicle at the time. In response to counsel's question as to whether she "agree[d] that [her] car was not traveling 5 miles an hour at the time of the impact," Rasheed answered that she did not remember. Kayman's counsel also asked Rasheed to quantify the impact of the collision:

"Q. Now, ma'am, you would agree that the impact between your car and Ms. Kayman's car was significant?

A. Yes.

Q. You would agree that the impact to your car – from your car to her car was heavy?

A. When you say – Can you give me a scale? Like ***

Q. Sure. On a scale of one to ten, one being a light tap and ten being a very strong impact, you would agree that it's much closer to ten?

A. I would have to say I know it's nowhere near one or two or three, but I can't really remember how much stronger it was than that."

After this testimony, Kayman's counsel attempted to introduce the photograph of the damage to Rasheed's car, but was stopped by the court.

¶ 15　Kayman's next witness was Dr. Marie Kirincic, a physician employed by Hinsdale Orthopedics specializing in rehabilitation and pain management. Dr. Kirincic stated she had first treated Kayman in November 2010 for neck pain, numbness, and tingling, and she opined that it was more likely true than not that the source of Kayman's pain was the vehicle collision.

¶ 16　Dr. Kirincic acknowledged that Kayman went to the emergency room on the day of the accident and followed up on a later date with Dr. Conroy. However, she offered no testimony regarding the findings of those visits. Dr. Kirincic also explained that Kayman had previously been treated by another physician at Hinsdale Orthopedics, Dr. Mark A. Lorenz, in February

2009. With the aid of Dr. Lorenz's notes, Dr. Kirincic explained that an exam at that time revealed "moderate degenerative changes" at the base of Kayman's neck. Dr. Kirincic testified that the degenerative condition "probably" made her more susceptible to injury at the time of the vehicle accident and that the degenerative condition was "probably" aggravated by the accident.

¶ 17 Dr. Kirincic further testified that since November 2010 she had treated Kayman for pain in her neck and upper back, muscle spasms, and numbness and tingling in her extremities. She testified that "every few months" in 2011 she had given Kayman "trigger point injections" to relieve muscle tightness in her shoulders and neck. Dr. Kirincic also instructed Kayman to use a "TENS unit," an electronic device using electrodes to relieve muscle spasms. She also testified that Kayman underwent physical therapy and acupuncture and had since continued to attend physical therapy and perform related home exercises. Dr. Kirincic testified that throughout 2012 she continued to treat Kayman for chronic pain in her neck and back of the head, muscle spasms, and headaches. Dr. Kirincic opined that these symptoms more likely than not were caused by the January 2009 vehicle collision.

¶ 18 When asked about Kayman's most recent visit in February 2013, which was just before trial, Dr. Kirincic stated there had been a "little progress with her pain, but it's still there." When asked for her opinion regarding whether Kayman will "ever completely get rid of the muscle spasm," Dr. Kirincic testified: "Probably not. She might still have this chronic myofascial pain with better days and worse days, and she will learn to cope with it and — and know what to do with certain bad flare-ups." Thus, Dr. Kirincic agreed this was a "permanent" condition.

¶ 19 Regarding future treatment, Dr. Kirincic opined that Kayman would probably need "at least quarterly or half-a-year visits for medication refills and maybe physical therapy on

occasions." She also testified that Kayman "might need occasionally some trigger point injections," although acknowledged the frequency was "hard to predict." Likewise, Dr. Kirincic testified that Kayman might need additional courses of physical therapy in case of an occasional "flare-up," and that Kayman would remain on muscle and nerve medications.

¶ 20 Kayman's counsel asked Dr. Kirincic if she expected that the cost of Kayman's treatments (including physical therapy, injections, and doctor's visits) to remain the same in the future. Dr. Kirincic responded: "We don't know what will happen next year, but right now [they] probably won't change." Asked for her opinion as to whether Kayman's pain would continue, Dr. Kirincic responded: "It's already fluctuating between minimal and severe, so she has wide ranges, but yes." Notably, Dr. Kirincic was not asked to provide, and did not offer, any specific figures or estimates for the expected costs of Kayman's treatment.

¶ 21 On cross-examination, Dr. Kirincic admitted that Kayman did not come to see her until November 2010, over a year and a half after the January 2009 vehicle collision. Dr. Kirincic also acknowledged that she had never reviewed the records from Kayman's emergency room visit on the date of the accident, nor had she reviewed the records from Dr. Conroy, Kayman's primary physician. Dr. Kirincic also admitted that she did not have any medical records for Kayman that predated January 2009.

¶ 22 When asked about records from Kayman's February 2009 visit to Dr. Lorenz, Dr. Kirincic agreed that an X-ray had indicated spondylosis, or degenerative changes in the spine. She acknowledged that this condition was part of the natural aging process and that such degenerative changes could not have been related to the accident because they take several years to develop. She also acknowledged that records from Kayman's April 2009 visit with Dr. Lorenz

reflected that Kayman had no complaints of neck pain and that Dr. Lorenz had recorded that Kayman's whiplash had "resolved." Dr. Kirincic agreed that such injuries typically "resolve within four to six weeks," and that some patients can recover from such injuries, even with underlying degenerative spinal changes. She likewise acknowledged that September 2009 notes from Dr. Lorenz found Kayman's mobility was much improved and that her numbness or tingling had subsided. Dr. Kirincic also agreed that Kayman had a diagnosis of carpal tunnel syndrome which was unrelated to the accident and which could also be a cause of numbness and tingling in her fingers.

¶ 23    Dr. Kirincic admitted the possibility that pre-existing degenerative changes in Kayman's spine could be causing some of Kayman's pain, regardless of the vehicle accident. She agreed that there were many possible causes of muscle pain or spasms, including lack of sleep or stress, and that Kayman had in fact reported stress. Dr. Kirincic also acknowledged that Kayman had not reported her 2006 MRI when she first saw her for treatment. Dr. Kirincic also confirmed that she had not instructed Kayman to restrict her physical activities, and she testified that Kayman was working and was a member of a health club.

¶ 24    On redirect examination, in reference to Dr. Lorenz's April 2009 note that Kayman had "resolved" her whiplash, Dr. Kirincic acknowledged that such symptoms could return. Dr. Kirincic reiterated her opinion that, although it was possible that a degenerative condition caused Kayman's symptoms, she believed it was more likely than not that her pain was caused by the 2009 accident.

¶ 25    On re-cross-examination, Rasheed's counsel asked Dr. Kirincic if it was likely "that any injury she suffered in his accident was merely a temporary aggravation of her underlying

degenerated condition and was then resolved" in April 2009. Dr. Kirincic answered: "It's hard to say, but it's possible that most of her symptoms resolved at that time, and then she had another flare-up later." No other medical witness was called by either party.

¶ 26     Kayman testified on February 14, 2013. She recalled that on the day of the accident, after exchanging contact information with Rasheed and speaking with a police officer, she initially declined medical treatment and went home. However, later that day she experienced neck pain, headache and nausea. She went to the emergency room at Hinsdale Hospital, where X-rays were taken, she spoke with a doctor, and was discharged.

¶ 27     Kayman testified that her pain worsened and she saw her family physician, Dr. Conroy, on February 4, 2009. Dr. Conroy referred her to Dr. Lorenz, who in turn prescribed pain medication and physical therapy. She began going to physical therapy two to three times a week and testified that her physical therapists had instructed her to do daily exercises with a foam tube, pilates ring, and other devices, which she continued to use regularly.

¶ 28     Kayman testified that her physical therapy and medication helped to alleviate, but did not eliminate, her neck pain and headaches. She acknowledged that she had improved somewhat as of April 2009, following her first course of physical therapy sessions, but that her symptoms worsened, leading her to return to Dr. Lorenz in September 2009. After a second round of physical therapy, Kayman testified she was referred to Dr. Kirincic for more specialized pain management because it was "the next best course of treatment" other than surgery. Kayman testified that on a number of visits, Dr. Kirincic administered trigger point injections that temporarily relieved her neck pain, but the relief lasted for only about two weeks after each visit.

¶ 29    Kayman testified that each night she used a TENS unit, prescribed by Dr. Kirincic, which she described as a device with electrodes that stimulated her neck muscles and helped her sleep. She also testified that each day she uses a home traction machine and continues to follow a routine of daily home exercises.  Apart from her doctor's visits, Kayman testified she had attended about 40 physical therapy sessions lasting about one hour each.  Kayman testified that she did not miss full work days to attend physical therapy, but would either go to sessions before work or that during the work day she would leave for physical therapy and return to work after each session.

¶ 30    Also on Kayman's direct exam, she acknowledged that in 2005 and 2006 she had episodes of pain in her back which had prompted her to visit her family physician.  She recalled that in 2005 she experienced back pain "between my shoulder blades" for three to six days after carrying a laptop computer on her shoulder.   In 2006, she again had back pain in the same area for approximately two weeks; she recalled this injury occurred after "straining with the gardening, carrying flats of flowers."   Kayman testified that she took over-the-counter drugs and her symptoms resolved.  She testified that she did not receive any medical attention for back pain between May 2006 and the vehicle accident in January 2009.

¶ 31    Regarding her current symptoms, Kayman testified that she suffers from daily headaches, as well as "pain emanating from my cervical areas of my spine."  She testified that pain interferes with her ability to travel, made driving more difficult, and prevented her from participating in recreational activities such as tennis.   She testified that she continues to take daily pain medications and uses the TENS unit and traction machine each day.  Notably, the appellate

record does not contain a transcript of the cross-examination of Kayman, and the parties' briefs do not describe the contents of such testimony.

¶ 32    On February 19, 2013, outside the presence of the jury, the court heard argument from counsel regarding the proposed content of their upcoming closing arguments.  In particular, Kayman's counsel sought to display a number of enlarged, poster-sized copies of pages from medical records of Kayman's emergency room visit, as well as records of certain visits to Dr. Lorenz and Dr. Kirincic.  Kayman argued that, to the extent such records had been admitted into evidence as business records, she had the right to use them during closing argument.  Rasheed objected, and the court proceeded to review each record at issue.

¶ 33    With respect to the emergency room records, the court noted that the jury had not heard any details about Kayman's treatment at the emergency room.  The court expressed concern that the records included discharge instructions, as well as diagnoses and specific medications.  As no witness had offered testimony on these topics, the court sustained the objection.  Kayman's counsel insisted that he could "use documents that were admitted in evidence in closing argument."  The court replied that it was "inappropriate" to use "selected pieces of records, which *** have been admitted into evidence but no one's ever spoken about them."  The court explained it would bar the records during closing argument because "the opportunity and risk of confusing the jury is great," noting that counsel "had an opportunity to elicit testimony from medically-trained persons about these documents" but had failed to do so.  As no witness had discussed the documents, the court reasoned, "to now simply read them or read selected portions of them *** does create the risk that a jury is going to misunderstand what is contained therein."

¶ 34    Rasheed similarly objected to Kayman's request to display medical records from Kayman's visit to Dr. Conroy on February 4, 2009.  The court sustained the objection, noting that, although Dr. Conroy had been deposed, the parties had "made a strategic decision not to utilize any portion of that evidence deposition so no juror has heard about this care and treatment of plaintiff with any specificity." The court found that use of these records in closing was "fraught with problems" as they included "many things that have never been talked about and could confuse the jury," such as specific medications prescribed to Kayman.

¶ 35    Similarly, the court barred Kayman from displaying notes from a February 2009 visit to Dr. Lorenz that contained "specific findings that have never been mentioned by any witness." Although Kayman argued that Dr. Kirincic had already testified regarding Dr. Lorenz's findings, the court found that the actual record was "fraught with all sorts of information that the jury has never heard anything about."  The court similarly held that Dr. Lorenz's records of visits in September 2009 and September 2010 would not be displayed because they contained findings and opinions that had not been discussed during trial testimony.  Although the court recognized that Dr. Kirincic had testified that she reviewed certain of the records in forming her opinions, the court determined this did not necessarily mean that they could be published to the jury during closing argument.

¶ 36    With respect to the contents of Rasheed's closing argument, Kayman objected to Rasheed's proposed use of a slide presentation that included bullet-point references to particular findings in the medical records, including a reference to the April 2009 record from Dr. Lorenz reporting that Kayman's whiplash had "resolved."   The court permitted such references, reasoning that such findings had been introduced as substantive evidence through Dr. Kirincic's

testimony and that Kayman had not objected. Kayman's counsel complained that allowing Rasheed to reference such records was unfair since the court had disallowed her from displaying medical records in her closing argument. The court responded that although Rasheed's presentation was "simply highlighting four bullet point entries" of documents that had been specifically discussed in Dr. Kirincic's testimony, Kayman had sought to display entire pages of medical records, including "medical diagnoses that were never put before this jury," which created "lots of opportunities to confuse the jury."

¶ 37    After overruling Kayman's objection to Rasheed's references to medical records, the parties gave closing arguments. Rasheed's counsel argued that the medical records showed that plaintiff had made a "full recovery" by April of 2009 and asked that the jury, at most, award the amount of medical expenses only through that date. Rasheed's counsel also noted that Kayman had not disclosed her 2006 MRI for back pain to either Dr. Lorenz or Dr. Kirincic when they treated her. A transcript of Kayman's closing argument was not included in the appellate record.

¶ 38    The jury returned a verdict in favor of Kayman in the total amount of $13,244. The verdict form reflected that the jury awarded $900 for past pain and suffering and $12,344 for medical expenses incurred. The jury did not award damages for past or future disability, expected future pain and suffering, or future medical expenses. The court entered judgment on the verdict on February 19, 2013.

¶ 39    Kayman filed a motion for new trial which asserted several errors, including the claim that the trial court abused its discretion in precluding her use of medical records in her closing argument. Kayman argued that the preclusion of these documents was prejudicial because they

supported her theory of causation, and she argued that the court had unfairly allowed Rasheed's closing argument to refer to medical records while not allowing Kayman to do the same.

¶ 40    Separately, Kayman asserted error in the trial court's ruling that evidence of her prior injury, as described in Dr. Conroy's deposition, would be admissible for impeachment purposes. Kayman argued that pursuant to *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49 (2000), the evidence should have been barred because Rasheed had not provided an "expert witness to testify that the prior pain, injury or treatment had any relevance to the case."  Kayman additionally asserted error in the court's decision barring her wage-loss claim, as she "suffered a loss of her time" due to her visits to physical therapy appointments.

¶ 41    Kayman's motion for new trial also asserted that the court erred in precluding admission of the photograph of damage to Rasheed's vehicle, which Kayman argued could be admitted either "to corroborate that the Plaintiff was injured" or as impeachment of Rasheed's trial testimony that she did not remember the speed at the time of impact.  Kayman's motion also asserted error with respect to the court's decision to bar her from introducing a day-in-the-life video, arguing that its "disclosure immediately before trial is no[t] prejudicial."

¶ 42    With respect to the jury verdict, Kayman argued that the failure to award damages for future pain, future medical expenses, and future disability was against the manifest weight of the evidence in light of Dr. Kirincic's testimony.  Kayman argued that the cumulative effect of these errors was to deny plaintiff a fair trial, entitling her to a new trial.

¶ 43    The court denied Kayman's motion for a new trial on July 22, 2013.  With respect to the use of medical records in closing argument, the court noted that the question of admissibility is distinct from whether evidence "can or should be published to the jury."  The court emphasized

that Dr. Kirincic never commented on either the emergency room records or records from Dr. Conroy. Although the court acknowledged that Dr. Kirincic had commented on Dr. Lorenz's records at trial, the court noted that Kayman's counsel did not isolate particular findings but sought to "present the records in their entirety." The court reasoned that it had discretion not to allow medical records that are too complex for the jury to understand and found the records at issue "clearly contained information that the jury could not understand on its own," such as "post-treatment instructions and medical terminology never discussed before the jury." Although the court acknowledged it had permitted Rasheed's counsel to reference certain portions of Dr. Lorenz's records, the court explained that "defendant's exhibit, unlike plaintiff's, highlighted those sections into four bullet points without referring to any extraneous information," whereas Kayman sought to display entire pages to the jury.

¶ 44 Regarding the evidence of prior injury contained in Dr. Conroy's deposition, the court recognized that *Voykin* generally requires a defendant to elicit expert evidence demonstrating why the prior injury is relevant. However, the trial court explained that in this case "Dr. Conroy's testimony was admitted because Dr. Kirincic opined that plaintiff's accident aggravated a preexisting degenerative condition in her neck." The trial court found the situation was similar to *Felber v. London*, 346 Ill. App. 3d 188 (2004), which held that a treating physician's testimony about the effects of an accident on a preexisting condition obviated the need for additional expert testimony to admit evidence of the prior condition.

¶ 45 Regarding Kayman's attempt to present a wage-loss claim for time spent at physical therapy sessions, the court emphasized that "plaintiff admitted during trial that she did not lose

any wages or benefits as a result of her injuries" and the "wage-loss claim was properly disallowed because she failed to demonstrate any compensable loss."

¶ 46     With respect to the photograph of damage to Rasheed's vehicle, the court reasoned that the average juror "without expert assistance lacks the knowledge necessary to correlate the damage depicted in the photograph with the specific neck and back injuries alleged by plaintiff." The court acknowledged its pretrial ruling that the photograph could impeach Rasheed's testimony regarding the speed at impact, but found that "plaintiff's counsel failed to elicit any testimony regarding the nature of the impact" from Rasheed.

¶ 47     The court also rejected Kayman's contention that it erred in barring her day-in-the life video. The court reasoned that it was inappropriate to admit the video "disclosed only two weeks before the trial date that was expressly extended due to plaintiff's earlier discovery failures." The court noted that day-in-the-life videos "do not constitute substantive evidence" but stated "this does not mean such videos can be disclosed at any time before trial."

¶ 48     Finally, the trial court rejected Kayman's argument that the jury's failure to award damages for future medical treatment was against the weight of the evidence. The court stated that "the jury had no obligation to accept Dr. Kirincic's testimony" and that the jurors "may have discounted Dr. Kirincic's testimony for a number of reasons." The court reasoned it would not "usurp the jury's role as fact finder by second guessing their damage award."

¶ 49     Kayman filed a timely notice of appeal on August 14, 2013, within 30 days of the denial of her posttrial motion. Thus, we have appellate jurisdiction pursuant to Illinois Supreme Court Rule 303(a).   Ill. S. Ct. R. 303(a) (eff. May 30, 2008).

¶ 50           ANALYSIS

¶ 51 Kayman's appeal reiterates many of the alleged errors discussed in her motion for new trial, namely: (1) that the trial court should not have barred Kayman from presenting certain medical records to the jury during closing arguments; (2) that the trial court erred in ruling that evidence of Kayman's prior injury would be admissible as impeachment evidence; (3) that the court erred in barring Kayman's use of the photograph of vehicle damage; (4) that the trial court erred in barring Kayman's presentation of a day-in-the-life video; and (5) that the court erred in barring a wage-loss claim based on Kayman's physical therapy appointments. Kayman also reiterates her contention that the jury verdict was against the manifest weight of the evidence and urges that the cumulative effect of the alleged errors denied her a fair trial.

¶ 52 We first discuss the trial court's rulings precluding Kayman from displaying certain medical records to the jury during closing arguments. The deferential abuse of discretion standard of review applies: "The scope of closing argument is within the sound discretion of the trial court and the reviewing court will reverse only if the argument is prejudicial." (Internal quotation marks omitted.) *Drakeford v. University of Chicago Hospitals*, 2013 IL App (1st) 111366, ¶ 50.

¶ 53 Kayman relies largely on the fact that the parties had stipulated that the records at issue were business records, yet "[t]he court later prevented [her] from using those very same records during closing argument." Kayman argues on appeal that although the trial court made "the distinction between admitting the records and publishing them to the jury, the court fails to justify why the records could not be commented on during closing, other than the possibility of confusing the jury."

¶ 54     Kayman's argument is unavailing, as the trial court has discretion to preclude admission or publication of evidence to prevent jury confusion. "Even relevant evidence may be excluded if its probative value is substantially outweighed by such factors as prejudice, confusion, or potential to mislead the jury." *Gill v. Foster*, 157 Ill. 2d 304, 313 (1993); see also *Werner v. Nebal*, 377 Ill. App. 3d 447, 454 (2007) ("[E]ven if evidence is arguably relevant, the trial court may still exclude the evidence if it would confuse *** the jury." (Internal quotation marks omitted.)).   This is certainly the case with medical records containing terminology unfamiliar to a lay jury.  See *Troyan v. Reyes*, 367 Ill. App. 3d 729, 736 (2006) ("Like all business records, medical records may be excluded if they are not relevant or are too complex for the jury to understand on its own.").

¶ 55     Kayman does not dispute that the records at issue contained medical terminology that had not been previously explained in the testimony of Dr. Kirincic, the lone witness with any medical expertise.  Kayman chose not to seek introduction of these records through Dr. Kirincic or any other witness with medical knowledge.   Had Kayman done so, Dr. Kirincic could have been asked to explain to the jury the medical terminology contained in the records, and Rasheed would have had an opportunity to conduct cross-examination regarding the contents of the records.  Instead, Kayman inexplicably attempted to present the contents of these records to the jury for the first time during closing argument.  Given the court's valid concern about jury confusion, we do not find that the trial court acted unreasonably in declining Kayman's requests to display these records during closing argument, even if the records were otherwise admissible.

¶ 56     We next address Kayman's contention that the trial court erred in holding that evidence of her prior complaints of back pain in 2005 and 2006 would be admissible as impeachment

evidence. Kayman relies on our supreme court's holding in *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49 (2000), which generally requires a defendant to produce expert testimony to support admission of evidence of a plaintiff's prior injury. In that decision, our supreme court recognized that "[i]n most cases, the connection between the parts of the body and past and current injuries is a subject that is beyond the ken of the average layperson." *Id.* at 59. As a result, "if a defendant wishes to introduce evidence that the plaintiff has suffered a prior injury *** the defendant must introduce expert evidence demonstrating why the prior injury is relevant to causation, damages, or some other issue of consequence. This rule applies unless the trial court, in its discretion, determines that the natures of the prior and current injuries are such that a lay person can readily appraise the relationship, if any, between those injuries without expert assistance." *Id.*

¶ 57    The *Voykin* court recognized that "a prior injury may be relevant as impeachment," but that "[t]his does not mean, however, that every undisclosed prior injury to the same part of the body is grounds for impeachment." *Id.* at 58. Rather, "[j]ust as with the substantive admission of evidence, trial courts should not permit inquiry into this area unless the prior injury is relevant to a fact in consequence, *i.e.*, whether the prior injury negates causation or negates or reduces the defendant's damages." *Id.*

¶ 58    In denying Kayman's motion for a new trial, the trial court acknowledged *Voykin*'s holding but stated that "Dr. Conroy's testimony was admitted because Dr. Kirincic opined that plaintiff's accident aggravated a preexisting degenerative condition in her neck." The trial court thus found this case similar to *Felber v. London*, 346 Ill. App. 3d 188 (2004). In *Felber*, which also involved a motor vehicle accident, the Second District of this court concluded that there was

no abuse of discretion in the admission of evidence of the plaintiff's prior injuries where "the jurors could readily appraise the relationship between the injuries of which Felber complained *** and her preexisting injuries without additional expert assistance." *Id.* at 193. Specifically, as the *Felber* jury had heard testimony from plaintiff's treating physician "about the possible effects of the collision on Felber's preexisting condition," the court concluded that this was "precisely the type of testimony that obviates the need for additional expert testimony" that would otherwise be required under *Voykin*. *Id.*

¶ 59     Although we agree with the trial court that Rasheed did not need to produce supporting expert testimony to admit the evidence of Kayman's prior injury, we do so for a different reason than that stated in the trial court's denial of Kayman's posttrial motion. Specifically, although the trial court relied on *Felber*, it appears that *Felber* is factually distinguishable. In this case, the evidence of prior injury subject to the disputed motion *in limine* was the discussion of the 2005-06 complaints contained in Dr. Conroy's testimony. Although Dr. Kirincic testified that Kayman showed signs of an ongoing degenerative spinal condition, Dr. Kirincic did not offer specific testimony regarding any relationship between Kayman's 2005-06 complaints of back pain and the injuries allegedly caused by the January 2009 collision with Rasheed's vehicle. Thus, it is not apparent that there was "precisely the type of testimony that obviates the need for additional expert testimony" that was present in *Felber*. See *Felber*, 346 Ill. App. 3d at 193. That is, Dr. Kirincic's testimony alone would not be sufficient to take this case out of the general rule expressed in *Voykin* that expert testimony is required to support admission of a prior injury. See *Voykin*, 192 Ill. 2d at 58-59.

¶ 60     However, we agree with trial court's earlier reasoning—expressed in its original pretrial ruling—that the evidence of the 2005-06 complaints contained in Dr. Conroy's deposition would nevertheless be admissible for impeachment, had Kayman failed to acknowledge such prior complaints in her trial testimony.  Kayman contends that, pursuant to *Voykin,* "the court should not have deemed the testimony of Dr. Conroy to be admissible for impeachment" as Rasheed did not offer expert testimony discussing  any causal link between Kayman's 2005-06 back pain and her current symptoms.  However, it is well established that, apart from relevance on substantive issues, evidence of a prior inconsistent statement may be admissible for impeachment.  See *People v. Moses*, 11 Ill. 2d 84, 87 (1957) ("Evidence of prior inconsistent statements by a witness is admissible to impeach his credibility.  [Citation.]  Such evidence is not admitted as proof of the truth of the facts stated out of court, but to cast doubt on the testimony of the witness by showing his inconsistency ***.").

¶ 61     In this case, had Kayman chosen to testify at trial that she had no history of back complaints, the 2005-06 complaints referenced in Dr. Conroy's deposition would constitute prior inconsistent statements.  Such evidence would impeach Kayman's credibility, creating a basis for admission independent of the substantive issue of causation.  Kayman complains that the trial court's ruling gave her "no choice at all as far as how to proceed on this issue, *i.e.*, [Kayman] was forced to introduce the evidence" of the 2005-06 complaints during her direct examination or risk impeachment with Dr. Conroy's deposition.  However, the trial court was entirely correct in instructing Kayman that she had to "pick her poison" —she could either acknowledge the prior complaints at trial, or deny any history of back problems and face impeachment with her prior inconsistent statements.

¶ 62    We next address Kayman's contention that the trial court should have permitted the admission of the photograph of damage to Rasheed's vehicle, either as substantive evidence on Kayman's injuries or as impeachment evidence. "The admission of evidence is largely within the discretion of the trial court, and its rulings will not be disturbed absent an abuse of discretion." *Werner v. Nebal*, 377 Ill. App. 3d 447, 454 (2007).

¶ 63    We do not find that the trial court abused its discretion in holding that the photograph was not admissible for the purpose of establishing the extent of plaintiff's injuries. "[T]his court has previously upheld circuit court rulings dismissing photographic evidence of a plaintiff's vehicle damaged in a collision where the circuit courts found the photographs to be irrelevant absent expert testimony and thus inadmissible as evidence of the extent of a plaintiff's injuries suffered in the collision. [Citations.]" *Williams v. City of Evanston*, 378 Ill. App. 3d 590, 599 (2007). In this case, the trial court could reasonably conclude, as stated in its posttrial order, that an "average juror, without expert assistance, lacks the knowledge necessary to correlate the damages depicted in the photograph" with Kayman's alleged injuries.

¶ 64    With respect to Kayman's attempt to use the photograph for impeachment on the issue of the speed of Rasheed's vehicle, we agree with the trial court's conclusion that Kayman's counsel "failed to elicit any testimony regarding the nature of the impact." The trial court had held that the photograph would be admissible to impeach Rasheed on the issue of speed, based upon Rasheed's deposition testimony that her car was only traveling at a speed of five miles per hour. However, at trial, Rasheed made no statement which opened the door to impeachment on this topic. Rather, Rasheed stated that she could not recall her speed:

"Q. Now, you do recall how fast your car was traveling at the time of the impact?

A. No, I don't.

Q. You would agree that your car was not traveling 5 miles an hour at the time of the impact?

A. I just don't remember. It's been four years."

¶ 65 Moreover, although testimony by Rasheed that the impact was minor could have opened the door to use of the photograph for impeachment, Rasheed at trial acknowledged the collision was *not* a minor impact. Rather, asked to describe the impact on a scale of 1 to 10, "one being a light tap and ten being a very strong impact," Rasheed testified that the impact was "nowhere near one or two or three, but I can't really remember how much stronger it was than that." Kayman argues that Rasheed "should not be able to avoid impeachment by simply stating that she does not remember." However, as Rasheed offered no testimony at trial minimizing the speed or force of impact, there was simply no basis to use the photograph of vehicle damage as impeachment on that issue. Thus, we cannot say that the trial court abused its discretion in barring its admission.

¶ 66 We next address Kayman's contention that the trial court erred when it denied her request to use a day-in-the-life video purporting to show the daily exercises prescribed as part of her physical therapy program. The video was disclosed to Rasheed's counsel approximately two weeks prior to the trial date. We again note our deferential standard of review: "The admission of a videotape or similar exhibit as demonstrative evidence is within the sound discretion of the circuit court and will not be disturbed absent an abuse of discretion. [Citation.] An abuse of

24

discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view." *Spyrka v. County of Cook,* 366 Ill. App. 3d 156, 166-67 (2006); see also *Donnellan v. First Student, Inc.*, 383 Ill. App. 3d 1040, 1051 (2008) ("We review a trial court's admission of a day-in-the-life video for an abuse of discretion, which occurs only when no reasonable person would agree with the decision of the trial court.").

¶ 67    Kayman argues that as demonstrative evidence, day-in-the-life videos are not subject to preclusion due to untimely disclosure; she relies on *Donnellan*'s holding that disclosure of a video the day before trial proceedings was not prejudicial. *Donnellan*, 383 Ill. App. 3d at 1052-53 (noting that as day-in-the-life videos are demonstrative and intended "to illustrate evidence regarding a party's life at the time of trial," disclosure just before trial "was not prejudicial"). In this case, the trial court acknowledged *Donnellan* but found it distinguishable because Kayman's trial date was "previously delayed because [Kayman] failed to comply with standard discovery requests." The trial court found it "inappropriate to admit plaintiff's day-in-the-life video when it was disclosed only two weeks before the trial date that was expressly extended due to plaintiff's earlier discovery failures."

¶ 68    Although Kayman correctly notes that, as demonstrated by *Donellan*, late disclosure does not automatically bar admission of a day-in-the-life video, that decision does not suggest that untimeliness may *never* be a valid reason for preclusion of such a video. Rather, we are mindful that matters involving trial scheduling and management are left to the trial court's sound discretion, which is afforded significant deference. See *In re D.T.*, 212 Ill. 2d 347, 356 (2004) (" 'Abuse of discretion' is the most deferential standard of review - next to no review at all - and is therefore traditionally reserved for decisions made by a trial judge in overseeing his or her

courtroom or in maintaining the progress of a trial."). Although day-in-the-life videos may not be substantive evidence, Kayman does not cite any authority suggesting that the trial court has less discretion, or that we should apply any less deference in reviewing the trial court's decisions regarding the use of demonstrative evidence.

¶ 69 As Kayman does not dispute that the trial date was initially delayed due to her conduct, we cannot say that no reasonable person would agree with the trial court's decision in this instance to deny the use of the video. Rather, the trial court could reasonably conclude that allowing the video to be disclosed just before trial would, in effect, improperly reward Kayman for delaying the original trial date. Thus, we cannot say that preclusion of the video was an abuse of discretion. Moreover, although Kayman argues that "barring the video prejudiced [her] case for damages in that it diminished her ability to demonstrate" her physical therapy exercises, the transcript reflects that she testified in detail regarding her various home exercises and that the jury viewed the devices prescribed by her physical therapists.

¶ 70 We next turn to Kayman's contention that the trial court erred in granting Rasheed's motion *in limine* precluding Kayman from claiming lost wages arising out of her physical therapy sessions. Notably, Kayman admits she suffered no lost compensation from her employer, whether in the form of hourly wages, salary, benefits, or otherwise. Indeed, her counsel acknowledged in argument on the motion *in limine* that "there's no question she was on a salary, she didn't lose her money," but that she "took off time from work during the workday" to obtain physical therapy. At trial, Kayman testified that she did not miss entire work days, but would leave work, attend a physical therapy appointment for approximately one hour, and return to her workplace the same day; otherwise, she would simply go to physical therapy before work.

¶ 71   Likewise, Kayman's appellate briefing makes no claim of monetary loss, but argues only that she "suffered a loss of her time as a result of her visit to physical therapy appointments." Kayman cites no authorities suggesting that a wage loss claim may be supported merely by a plaintiff's time spent obtaining medical treatment, absent any calculable loss of monetary compensation or employment benefits.   Although Kayman notes the Illinois Pattern Jury Instruction that a plaintiff may recover for the "value of (time) (earnings) (profits) (salaries) (benefits) lost" (Illinois Pattern Jury Instructions, Civil, No. 30.07 (2011)), there is no claim in this case that Kayman was paid by the hour or otherwise lost earnings as a result of the time spent in physical therapy.   It is well-settled that "[t]here can be no recovery of speculative or unproved damages." *Thornhill v. Midwest Physician Center of Orland Park*, 337 Ill. App. 3d 1034, 1051 (2003) (finding no abuse of discretion in trial court's refusal to allow plaintiff to present testimony of future lost wages where plaintiff admitted that she remained employed full-time).   As Kayman did not identify any cognizable economic damages arising from her physical therapy sessions, the court did not abuse its discretion in precluding her wage loss claim.

¶ 72   Apart from the trial court's rulings, Kayman separately argues that the failure of the jury to award damages for future pain and suffering, future medical expenses, and future disability was against the manifest weight of the evidence.  Kayman relies on the testimony of Dr. Kirincic that Kayman would likely continue to experience symptoms and receive periodic medical treatment.  Kayman argues on appeal that Dr. Kirincic established that Kayman "is expected to have pain and suffering, disability, and medical treatment into the future" and that the cost of such treatment "would be similar to what the cost for medical care is now."

¶ 73    "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence."  (Internal quotation marks omitted.)  *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992).  "[I]t is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony."  *Id.* at 452.

¶ 74    Contrary to Kayman's position, the jury was not obligated to award damages for future pain or medical treatment after Dr. Kirincic offered her opinion that Kayman would have future pain and medical care.  Rather, even without any conflicting testimony disputing Dr. Kirincic's opinion, the jury was entitled to find that Dr. Kirincic's testimony was not credible.  "[A] jury's province as fact finder is not impermissibly invaded even by expert testimony expressed in absolute terms, since jurors remain free to disbelieve and disregard such testimony."  *Lange v. Freund*, 367 Ill. App. 3d 641, 651 (2006) (citing *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 545 (1995)).  Notably, the most explicit testimony regarding future medical costs elicited from Dr. Kirincic was the equivocal statement that "[w]e don't know what will happen next year, but right now [they] probably won't change."  Especially as Kayman failed to present any witness offering any specific estimate of the dollar amount of any future medical costs, the jury could reasonably have concluded that Kayman had not offered sufficient proof of such damages.  Alternatively, the jury could have also concluded that an award of future damages was unsupported in light of Dr. Kirincic's admissions on cross-examination regarding other possible causes of Kayman's symptoms.   In any event, it is not our role to second-guess such credibility determinations, and

the jury's decision not to award future damages does not render the verdict against the manifest weight of the evidence.

¶ 75    Kayman claims that she was denied a fair trial as a result of the cumulative effect of the trial court's alleged errors.  "Where the cumulative effect of errors made by a trial court so deprives a party of a fair trial that the verdict may have been affected, a new trial is necessary." *Mueller v. Phar-Mor, Inc.*, 336 Ill. App. 3d 659, 670 (2000).  However, as discussed above, we do not find that the trial court abused its discretion in its rulings or that the jury's verdict was against the manifest weight of the evidence.  Accordingly, we do not find that Kayman is entitled to a new trial.

¶ 76    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 77    Affirmed.